UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL ACTION |
| VERSUS | |
| RANDY J. LAMARTINIERE | NO. 18-00087-BAJ-RLB |

### RULING AND ORDER

Before the Court is Defendant's **Motion For New Trial (Doc. 227)** and Defendant's **Motion For Judgment Of Acquittal (Doc. 228)**. The United States opposes each motion. (Docs. 234, 235). Defendant's motions will be denied.

I. BACKGROUND

This matter proceeded to jury trial on December 5, 2022, under a Superseding Indictment charging Defendant with 28 counts of unlawful distribution of Schedule II controlled substances, in violation of 21 U.S.C. § 841(a)(1).[1] (Docs. 114, 210). Defendant was formerly a licensed medical practitioner, and each count alleged that Defendant unlawfully dispensed prescriptions for painkillers and stimulants in 2015 and early 2016, when he operated his own medical practice in Baton Rouge, Louisiana. The United States and the Defendant each presented a case, and on December 9 the evidence was submitted to the jury for decision. (Docs. 210, 211, 213, 217, 219). After approximately four hours of deliberation, the jury rendered its verdict convicting Defendant of 20 counts of unlawful distribution of controlled substances,

---

[1] On October 17, 2022, the Court granted the United States' motion to dismiss two additional counts of unlawful distribution of Schedule II controlled substances set forth in the Superseding Indictment. (Docs. 176, 195).

and acquitting Defendant of the remaining eight counts. (*See* Docs. 219, 222). Defendant's sentencing hearing is set for March 30, 2023. (Doc. 219).

Now Defendant moves for new trial, arguing (1) the Court's jury instructions regarding the meaning of "authorization" under 21 U.S.C. § 841 misstated the law; (2) the Court's "deliberate indifference" instruction was not supported by the evidence; (3) the United States' expert witness, Dr. Gene Kennedy, was unqualified to offer opinions regarding whether Defendant's prescriptions were legitimate or illegitimate; and (4) cumulative error deprived Defendant of a fair trial. (Doc. 227). Alternatively, Defendant moves for judgment of acquittal, arguing that the evidence against him was not sufficient to establish that he knowingly dispensed prescriptions without "authorization," as required by 21 U.S.C. § 841. (Doc. 228).

## II. LAW AND ANALYSIS

### A. Motion For New Trial

Federal Rule of Criminal Procedure ("Rule") 33 authorizes the Court to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Yet, despite Rule 33's seemingly broad grant of discretion, the U.S. Court of Appeals for the Fifth Circuit stresses that motions for new trial are "disfavored," *United States v. Mahmood*, 820 F.3d 177, 190 (5th Cir. 2016), and should be granted "infrequently by district courts, unless warranted by 'exceptional' circumstances." *United States v. Tarango*, 396 F.3d 666, 672 (5th Cir. 2005).

> Broadly speaking, Rule 33 is exercised in two situations. One is when error infects the trial—perhaps the erroneous admission or exclusion of evidence, inflammatory comments by a lawyer, or faulty jury instructions. The other is when the court believes the evidence weighs

2

heavily against the verdict.

*United States v. Crittenden*, 46 F.4th 292, 296 (5th Cir. 2022).

Here, no exceptional circumstances justify a new trial.

### i. The Court properly instructed the jury regarding 21 U.S.C. § 841's "authorization" element

First, this Court has already thoroughly addressed (and rejected) Defendant's objection(s) that the Court mischaracterized the "authorization" element of unlawful dispensation of prescription drugs under 21 U.S.C. § 841, explaining on the record at the December 8, 2022 charge conference that Defendant's position that "a prescription is unauthorized if and only if it is not issued for a legitimate medical purpose" simply is *not* supported by controlling Supreme Court and Circuit precedent. (Doc. 227 at p. 4). Rather, the Circuit expressly instructs that "authorization" is a *two-prong* test, requiring *both* (1) that the prescription was "issued for a legitimate medical purpose," *and* (2) "in the usual course of … professional practice":

> The regulation [21 C.F.R. § 1306.04] states that for a "prescription for a controlled substance to be effective[, it] must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04. Both prongs are necessary for a prescription to be legitimate; one is not sufficient. *Id.* The logical converse is that a practitioner is unauthorized to dispense a controlled substance if the prescription *either* lacks a legitimate medical purpose *or* is outside the usual course of professional practice. In other words, knowingly distributing prescriptions outside the course of professional practice is a sufficient condition to convict a defendant under the criminal statutes relating to controlled substances.

*United States v. Armstrong*, 550 F.3d 382, 397 (5th Cir. 2008) (citation omitted), *overruled on other grounds by United States v. Balleza*, 613 F.3d 432, 433 n.1 (5th Cir. 2010) (per curiam).

The Fifth Circuit's definition of the authorization element survives the U.S. Supreme Court's holding in *Ruan v. United States*, which held merely that a conviction for unlawful dispensation of prescriptions under § 841 requires the Government to prove that the medical professional defendant "knew or intended that his or her conduct was unauthorized." 142 S. Ct. 2370, 2382 (2022). Put differently, *Ruan* did not address—much less disturb—the Fifth Circuit's two-prong test, as recognized most recently by the Eleventh Circuit, and at least one District Court. *See United States v. Mencia*, No. 18-13967, 2022 WL 17336503, at *7 (11th Cir. Nov. 30, 2022) ("To convict a physician of violating Section 841(a)(1), the government must prove that he dispensed controlled substances for other than legitimate medical purposes in the usual course of professional practice, and that he did so knowingly and intentionally. Because the Act prohibits the distribution of prescription drugs that is not authorized, a distribution is unlawful if 1) the prescription was not for a 'legitimate medical purpose' or 2) the prescription was not made in the 'usual course of professional practice." (quotation marks and citations omitted)); *United States v. Taylor*, No. 21-cr-00013, 2022 WL 4227510, at *2 (E.D. Ky. Sept. 13, 2022) (Van Tatenhove, J.) ("[T]he [*Ruan*] Court implicitly re-affirmed the long-held notion that the CSA criminalizes conduct by doctors, just as it does street dealers and drug traffickers, if they are acting outside the course of professional practice.").

Here, after carefully considering the Supreme Court's *Ruan* decision, the Fifth Circuit's *Armstrong* decision, and the arguments of the parties at the charge conference, the Court provided the following instruction regarding the authorization

4

element:

> A prescription is "authorized" if it is issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. Both prongs are necessary for a prescription to be authorized; one is not sufficient. That is, the prescription must be issued for a legitimate medical purpose and within the usual course of a practitioner's professional practice.
>
> By contrast, a prescription is unauthorized if the prescription either lacks a legitimate medical purpose or is outside the usual course of professional practice. In other words, knowingly issuing a prescription outside the course of professional practice is a sufficient condition to convict a medical practitioner of unlawful dispensation of a controlled substance. Likewise, knowingly issuing a prescription without a legitimate medical purpose is a sufficient condition to convict a medical practitioner of unlawful dispensation of a controlled substance.

This instruction is complete and correct under *Ruan* and *Armstrong*. Defendant's renewed objection is baseless.

Defendant's remaining objections to the Court's "authorization" instruction are scattershot, at times bordering on unintelligible. (*See* Doc. 227 at pp. 16-40). Three, however, deserve attention. First, Defendant is wrong to state that the Court's instructions "did not require the Government to prove that the defendant knew the charged prescriptions were unauthorized." (*See* Doc. 227 at p. 16). To the contrary, as required by *Ruan*, 142 S. Ct. at 2382, the Court *expressly* instructed the jury that "to find the defendant guilty of the crimes alleged in each count of the Indictment, you must be convinced that the government has proved each of the following beyond a reasonable doubt: ... the defendant knew that he was acting in an unauthorized manner when he dispensed the controlled substance, or intended to act in an unauthorized manner."

Second, there is no authority whatsoever for Defendant's position that the

5

federal regulations cannot be referenced when determining the contours of the authorization element. (*See* Doc. 227 at pp. 19-40). Rather, as set forth above, the most recent authorities illustrate that even after the *Ruan* decision, 21 C.F.R. § 1306.04 remains the touchstone for defining "authorization" under § 841. *See Mencia*, 2022 WL 17336503, at *7 ("Because the Act prohibits the distribution of prescription drugs that is not authorized, a distribution is unlawful if 1) the prescription was not for a 'legitimate medical purpose' or 2) the prescription was not made in the 'usual course of professional practice.'" (quotation marks and citations omitted)).

Finally, and bizarrely, Defendant suggests that he is immune from prosecution under § 841 because he is (was) a doctor, and not a drug dealer as "conventionally understood." (Doc. 227 at pp. 19-20). Whatever privileges Defendant may have enjoyed as a highly educated, well-compensated medical professional, certainly he was *not* entitled to unlawfully dispense opioids and stimulants by virtue of his elevated status. To the point, a medical professional that knowingly dispenses unauthorized prescriptions is merely a "conventional" drug dealer by another name. *E.g., Armstrong*, 550 F.3d 382, 397 (5th Cir. 2008) ("[K]nowingly distributing prescriptions outside the course of professional practice is a sufficient condition to convict a defendant under the criminal statutes relating to controlled substances."); *Taylor*, 2022 WL 4227510, at *2 ("[T]he CSA criminalizes conduct by doctors, just as it does street dealers and drug traffickers, if they are acting outside the course of professional practice.").

6

### ii. The Court's "deliberate ignorance" instruction was supported by the evidence

Next, Defendant renews his objection to the Court's inclusion of the Fifth Circuits' pattern "deliberate ignorance" instruction, arguing that it was not supported by the evidence presented at trial.[2] (Doc. 227 at pop. 40-48). Again, this objection was thoroughly addressed on the record (and overruled) at the December 8, 2022 charge conference, and, again, the objection is baseless.

The Fifth Circuit's pattern "deliberate ignorance" instruction provides:

> You may find that a defendant had knowledge of a fact if you find that the defendant deliberately closed his eyes to what would otherwise have been obvious to him. While knowledge on the part of the defendant cannot be established merely by demonstrating that the defendant was negligent, careless, or foolish, knowledge can be inferred if the defendant deliberately blinded himself to the existence of a fact.

The evidence at trial plainly showed that Defendant ignored multiple obvious signs that his patients were abusing or illegally diverting the prescriptions he wrote for them. In particular, the undercover recordings of Defendant's interactions with law enforcement agents posing as patients captured numerous statements confirming that Defendant was acutely aware of the illegality of his conduct. For example, Defendant told undercover officer Matt Dixon that a non-controlled substance (Tylenol) would be "a little bit more legal" than the hydrocodone Dixon requested, *and* that the treatment Dixon requested was "illegal," and could get Defendant "in trouble." Still, Defendant provided Dixon the prescriptions he requested, *without*

---

[2] Curiously, Defendant asserts that the Court delivered the "deliberate ignorance" instruction *sua sponte*. (Doc. 227 at p. 41). Again, Defendant is wrong. The Government requested the "deliberate ignorance" instruction *three* times in advance of Defendant's trial. (*See* Doc. 56 at p. 2; Doc. 125-1 at p. 2; Doc. 181 at p. 3).

7

requesting medical records or ordering drug tests, or even meaningfully examining Dixon to confirm Dixon's purported leg injury, even after Dixon repeatedly *switched* the leg that was allegedly injured.

Defendant's recorded visits with undercover officer Craig Crawford followed the same pattern. At his first appointment, Crawford told Defendant that he took "roxies" and "addies" because they made him feel good. Defendant responded that Crawford's purported symptoms were "not really" serious enough to justify hydrocodone or oxycodone, but still provided Crawford multiple prescriptions, despite being unable to ascertain where Crawford was filling his prescriptions. Defendant admitted that he was not properly verifying whether Dixon was illegally diverting pills, told Crawford that he (Defendant) "had to be careful" because Crawford's treatment (the prescriptions) did not "look right," yet still refilled Crawford's prescriptions even after Crawford fabricated a story that his medication was stolen when he "went and stayed at a chick's house."

This evidence (and more) was sufficient to establish a basis to conclude that Defendant "deliberately closed his eyes to what would otherwise have been obvious to him"—specifically, that he was writing prescriptions without a legitimate medical purpose and outside the scope of professional practice. As discussed in more detail at the charge conference, the deliberate ignorance instruction was justified and appropriate in this case.

### iii. The Court properly admitted the expert testimony of Dr. Gene Kennedy

Next, Defendant complains that the Court "should not have qualified" the

8

United States' expert witness, Dr. Gene Kennedy, to offer opinions regarding whether Defendant's prescriptions were legitimate or illegitimate, because Dr. Kennedy "did not hold any relevant certifications or accreditations." (Doc. 227 at p. 51). Significantly, Defendant does *not* specify what "relevant certifications or accreditations" Dr. Kennedy should have held, or explain how any such "certifications or accreditations" would have made him a more credible witness. This Court has repeatedly admonished that it will not speculate on arguments that have not been advanced, or attempt to develop arguments on a party's behalf, and that issues not briefed are waived. *Doe v. Bd. of Supervisors of Univ. of Louisiana Sys.*, --- F.Supp.3d ----, 2023 WL 143171, at *17, n.13 (M.D. La. Jan. 10, 2023) (Jackson, J.).

In any event, Dr. Kennedy was more than adequately qualified to offer expert opinion regarding the legitimacy of Defendant's prescription practices. Federal Rule of Evidence 702 states that an expert may be qualified based on "knowledge, skill, experience, training, or education," and the Fifth Circuit instructs that "to qualify as an expert, the witness must have such knowledge or experience in his field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth." *United States v. Hicks*, 389 F.3d 514, 524 (5th Cir. 2004) (quotation marks and alterations omitted). As set forth on the record at trial, Dr. Kennedy maintains decades of practical experience, including years of specialized experience in the pain management field. As a result, he has obtained a thorough understanding of the laws and regulations governing the practice of pain management and prescribing pain medication, and has qualified as an expert in various federal and

9

state courts 18 times. Certainly, Dr. Kennedy's review and opinion of Defendant's prescription practices was capable of aiding the jury in reaching its decision as to whether Defendant was issuing prescriptions for a legitimate medical purpose and within the scope of professional practice. *See id.*; *e.g.*, *Mencia*, 2022 WL 17336503, at *9 (district court properly admitted expert testimony in an opioid distribution case, post-*Ruan*: "what practices fall within the usual course of professional practice is precisely what an expert is needed to define"); *United States v. Spayd*, No. 19-cr-0111, 2022 WL 4367621, at *6-7 (D. Alaska Sept. 20, 2022) (Kindred, J.) (post-*Ruan*, ruling that "the jury may hear expert opinion evidence regarding what constitutes a legitimate medical purpose and the boundaries of the scope of usual professional practice," and that the experts "may opine that [the defendant's] prescriptions were made with no apparent legitimate medical purpose or outside the usual professional practice").

### iv. Defendant has failed to establish that cumulative error deprived him of a fair trial

Finally, Defendant half-heartedly complains that cumulative error deprived him of a fundamentally fair trial. (Doc. 227 at pp. 53-54). Having failed to identify even *one* error affecting his trial, it follows that Plaintiff cannot identify an aggregate of errors that so deeply impacted these proceedings as to require another go-around. *See United States v. Anderson*, 755 F.3d 782, 799 (5th Cir. 2014) ("Only one error was committed at trial—the prosecutor's reference to facts not in evidence. Accordingly, we conclude that the cumulative error doctrine is inapplicable to this case.").

## B. Motion For Judgment Of Acquittal

Rule 29(c) permits the Court to set aside a jury's verdict of guilty for any offense for which the evidence is insufficient to sustain a conviction. Fed. R. Crim. P. 29(c). Again, however, the law is clear that the Court's discretion under Rule 29(c) is limited. First, as an over-arching rule, the evidence must be viewed "in the light most favorable to the prosecution," *United States v. Valle*, 538 F.3d 341, 344 (5th Cir. 2008) (quotation marks omitted). This means that the Court's review of the evidence, inferences, *and* credibility determinations "is highly deferential." *United States v. Moreno–Gonzalez*, 662 F.3d 369, 372 (5th Cir. 2011); *United States v. Villarreal*, 324 F.3d 319, 322 (5th Cir. 2003). Second, the evidence should not be examined in isolation, but as part of the totality of all of the evidence at trial. *See United States v. Vergara*, 687 F.2d 57, 61 (5th Cir. 1982). Third, the jury "retains the sole authority to weigh any conflicting evidence and to evaluate the credibility of the witnesses," *United States v. Loe*, 262 F.3d 427, 432 (5th Cir. 2001), and, thus, "it is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt." *Moreno-Gonzalez*, 662 F.3d at 372 (quotation marks and alterations omitted). Finally, "what the [jury] is permitted to infer from the evidence in a particular case is governed by a rule of reason, and … [jurors] may properly use their common sense and evaluate the facts in light of their common knowledge of the natural tendencies and inclinations of human beings." *See United States v. Surtain*, 519 Fed. App'x 266, 277 (5th Cir. 2013) (quoting *United States v. Ayala*, 887 F.2d 62, 67 (5th Cir. 1989)). As a result, even if

11

the defendant presents a plausible, non-criminal explanation for his actions, that is not enough to upset the verdict because "a jury is not required to accept *any* alternative explanation." *United States v. Winkler*, 639 F.3d 692, 700 (5th Cir. 2011).

Defendant has already moved twice for judgment of acquittal—after the United States' rested its case-in-chief, and again after the United States elected not to present a rebuttal to Defendant's case. (Doc. 217). Each time the Court rejected Defendant's gambit, for reasons fully explained on the record. Defendant's latest attempt to evade the evidence against him fares no better.

As instructed to the jury, a conviction under 21 U.S.C. § 841 for unlawful dispensation of controlled prescriptions requires that four elements be proved beyond a reasonable doubt:

> *First*: That the defendant dispensed a controlled substance;
>
> *Second:* That the defendant dispensed the controlled substance knowingly or intentionally;
>
> *Third*: That the defendant's dispensation of the charged controlled substance was not authorized; and
>
> *Fourth:* That the defendant knew that he was acting in an unauthorized manner when he dispensed the controlled substance, or intended to act in an unauthorized manner.

Here, as before, Defendant does not even attempt to argue that the evidence was insufficient to establish the first two elements. Instead, again, Defendant challenges only whether the evidence established that he knowingly dispensed prescriptions without authorization, based on the same misguided view of "authorization" rejected above: specifically, that a prescription is "authorized" solely if it serves "a legitimate medical purpose." (*See* Doc. 228 at p. 1). But, again, the

Circuit is clear that "authorization" requires more: a prescription must *also* be issued in "the usual course of professional practice." *Armstrong,* 550 F.3d at 397. "In other words, knowingly distributing prescriptions outside the course of professional practice is a sufficient condition to convict a defendant under the criminal statutes relating to controlled substances." *Id.* And, again, this interpretation survives *Ruan*. *See Mencia,* 2022 WL 17336503, at *7.

Applying the correct view of "authorization," Defendant's challenge to the sufficiency of the evidence falls flat. Counts 1 through 7 of the Superseding Indictment charged Defendant with unlawfully issuing oxycodone prescriptions to seven separate patients on January 5, 2016, *after* the Louisiana State Board of Medical Examiners *suspended* Defendant's license to prescribe controlled substances. Defendant admitted on the stand that he received notice of his suspension not later than January 4, 2016. Given Defendant's admission, certainly it was reasonable for the jury to infer that Defendant knew he was unlawfully issuing prescriptions outside the course of professional practice when he wrote prescriptions on January 5.

Counts 12 through 16 charged Defendant with unlawfully issuing hydrocodone, oxycodone, and Adderall prescriptions to undercover agent Matt Dixon on five separate occasions between April and July, 2015. Counts 24 through 27 charged Defendant with unlawfully issuing hydrocodone and oxycodone prescriptions to undercover agent Craig Crawford on four separate occasions between July and September, 2015. Notably, the jury *acquitted* Defendant of Counts 12 and 24, corresponding to each agents' first visit to Defendant's medical practice. Nonetheless,

13

the jury convicted Defendant on the counts related to all subsequent visits. As set forth above, the recordings of Defendant's conversations with these agents include multiple damning admissions from Defendant's own mouth, including that the prescriptions he wrote for Agent Dixon were "illegal," and could get Defendant "in trouble," and that the prescriptions he wrote for Agent Crawford were "not really" necessary, and that, as a result, he "had to be careful" because they did not "look right." Obviously, the jury could reasonably infer from these recorded statements that Defendant knew that the prescriptions he wrote for the undercover agents were *not* for a legitimate medical purpose *and* were outside the course of professional practice.

Defendant's remaining counts of conviction—Counts 9, 18, 19, 28, 29, and 30—related to prescriptions for Adderall, oxycodone, oxymorphone, and methadone issued to three actual patients on six occasions between August and December, 2015. As to each, Dr. Kennedy testified based on his review of Defendant's record that the prescriptions were not medically necessary, were not medically appropriate, and actually placed the patients in danger. Dr. Kennedy's testimony further established that Defendant's purported beliefs regarding the medical necessity of these prescriptions were patently unreasonable.

Additionally, the testimony of patients Charles Henson and Brian Boudreaux established: (1) they sought prescriptions from Defendant after being cut off by other doctors, because they knew by Defendant's reputation that Defendant would give them the prescriptions they wanted; (2) they obtained prescriptions from Defendant based on undocumented and unverified reports of accidents, with minimal (if any)

14

supporting medical records or tests; (3) in the course of their "treatment" with Defendant, Defendant learned that they were drug addicts—even testing positive for drugs *not* prescribed by Defendant (heroin, in Boudreaux's case); yet, (4) Defendant continued to write prescriptions for these patients, and failed to take steps to wean them off drugs or even transition them to less addictive or less harmful drugs. Again, based on this evidence (and more), it was reasonable for the jury to infer that Defendant's prescriptions to his actual patients were *not* for a legitimate medical purpose *and* were outside the course of professional practice.

### III. CONCLUSION

Accordingly, for the reasons set forth herein, in addition to the reasons previously set forth on the record at trial,

**IT IS ORDERED** that Defendant's **Motion For New Trial (Doc. 227)** be and is hereby **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's **Motion For Judgment Of Acquittal (Doc. 228)** be and is hereby **DENIED**.

Baton Rouge, Louisiana, this 9th day of March, 2023

_____
**JUDGE BRIAN A. JACKSON**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**